

# John Howard Association of Illinois

300 West Adams Street,  Suite 423  Chicago, IL  60606
Tel. 312-782-1901  Fax. 312-782-1902  www.john-howard.org



# FILED

AUG 3 0 2007
AUG 30 2007
Judge Robert W. Gettleman
United States District Court

**King v. Walker et al.**
No. 06 C 204

United States District Court
for the Northern District of Illinois
Eastern Division

The Honorable Robert W. Gettleman

August 16, 2007

COURT MONITOR'S REPORT

**John Howard Association**
300 West Adams Street, Suite 423
Chicago, IL 60606
312-782-1901

This report reflects monitoring activities relating to an assessment of compliance with the Consent Decree in this case. These activities have included: observations of preliminary parole revocation hearings at both the Cook County Department of Corrections (CCDOC) and the Northern Reception Center operated by the Illinois Department of Corrections (IDOC) on several occasions; analysis of data, including **King** hearing schedules, individual hearing reports, and other documents introduced during hearings and generated by staff of the Illinois Prisoner Review Board (PRB), IDOC, various law enforcement agencies, and other data; and meetings with PRB, IDOC, and CCDOC administrators and staff, and counsel for the parties (including counsel for the Sheriff of Cook County). Most of the monitoring activities have been conducted by or under the supervision of Charles A. Fasano, Director of the Prisons and Jails Program of the John Howard Association (JHA). The Association's Executive Director, Malcolm C. Young, has also observed hearings and participated in a number of meetings and other activities. In addition, other JHA staff have observed hearings and analyzed data.

The scope of this report covers the major provisions of the Consent Decree during a period of slightly more than six months, dated from the approval of the Consent Decree on January 26, 2007. As noted below, some of the data evaluated predate the approval of the decree. These data are included to provide the most comprehensive depiction of issues relating to compliance with decree provisions. The report also includes recommendations for improvements that could enhance the quality and consistency of the hearing process and related activities. The report concludes with a summary of areas that will be included in future monitoring reports.

## HEARINGS AT CCDOC AND IDOC

The vast majority of **King** hearings have been conducted by Jeanetta Cardine, currently an Executive with the Illinois Prisoner Review Board and formerly an IDOC Parole Agent. Ms. Cardine began conducting parole revocation hearings for the PRB in March 2006 and has spent a considerable portion of her time on these activities since then. Her other activities on behalf of the PRB are, however, also relevant to some of the members of the plaintiff class, and these activities are described below. Several other PRB staff members have also been trained to conduct **King** hearings and have done so on some occasions when Ms. Cardine has been on vacation or was otherwise unavailable.

**King** hearings have occurred once weekly at CCDOC since June 2006[1] and twice weekly at NRC since January 2007. The hearings at CCDOC occur every Wednesday beginning at 9:00 a.m. and normally extend over a period of two to four hours. Hearings at NRC occur every Monday and Thursday, and these hearings also begin at 9:00 a.m. At NRC, there are normally fewer hearings on Monday than on Thursday. This is explained by the schedule of inmate shipments from CCDOC to IDOC, which normally occur at least three days each week. Hearings on Mondays normally cover a period of three hours or more, while hearings on Thursdays frequently span a period of five hours.

Based on data provided to the Monitor, the majority of **King** hearings since entry of the Consent Decree in this case were held at IDOC's Northern Reception Center following the transfer of inmates from CCDOC. A total of 631 hearings resulting in dispositions (either

---

[1] Some of the parole revocation hearings held at CCDOC before December 31, 2006 were Morrissey hearings.

probable cause or no probable cause) occurred at CCDOC during the period June 14, 2006 – August 8, 2007. In contrast, a total of 1,414 hearings resulting in comparable dispositions occurred at NRC during the period January 4, 2007 – August 6, 2007, a significantly shorter period than that for the hearings at CCDOC. The data indicate that 30.9% of completed hearings occurred at CCDOC during a period of approximately 14 months, in comparison to 69.1% of completed hearings which occurred at NRC during a period of seven (7) months.

A more accurate comparison of the relative frequency of hearings at the two locations can be gained by analyzing data for calendar year 2007. Since January 10, 2007, a total of 370 hearings resulting in dispositions occurred at CCDOC. In comparison to the 1,414 comparable hearings at NRC, hearings at CCDOC represent 20.7% of **King** hearings with dispositions, as contrasted to 79.3% of King hearings that occurred at NRC during 2007. The fact that roughly only one of every five King hearings is occurring while inmates are still at CCDOC may well reflect policy changes introduced by the current Sheriff, who took office in December 2006. In July 2007, the PRB reportedly had no hearing docket for revocation hearings at CCDOC. All inmates facing these hearings had been shipped to NRC before their final revocation hearings were held. Additional commentary on the status of these efforts and other factors relating to the continuing overcrowding at CCDOC, as well as impending developments affecting this situation, are provided below.

At both CCDOC and NRC, inmates have been requesting continuances with considerable frequency. In addition to the 631 dispositions at CCDOC, 251 (26.2%) continuances were

granted upon request of inmates.[2]  In comparison, 394 (21.7%) cases were continued during hearings conducted at NRC.  Based on observations by JHA staff during hearings and discussions with Ms. Cardine, the vast majority of continuances are requested in order to wait for preliminary hearings or other court appearances.  Many inmates believe, rightly or wrongly, that criminal charges will be dropped during the next court appearance, which they believe will enhance their chances of receiving a finding of no probable cause at the **King** hearing.[3]

The greater frequency of continuances for **King** hearings conducted while inmates were still at CCDOC is likely attributable to the fact that a higher percentage of these inmates have made only one court appearance for a bond hearing, since preliminary hearings frequently do not take place for several weeks after inmates are jailed.  Although we have been unable to calculate the specific percentage of inmates who appear for their first **King** hearing at CCDOC but do not receive a disposition until they arrive at NRC, the number appears to be significant.

## TIMELINESS OF HEARINGS

Our assessment of the timeliness of **King** hearings is based largely on a review of data contained in daily hearing schedules and records, which provide summary information on both hearing decisions and most of the dates pertinent to the time provisions of the Consent Decree. Our review of these documents has revealed several minor but critical modifications needed to determine whether **King** hearings at CCDOC occur within the timelines specified in the Consent

---

[2] An additional 74 scheduled hearings (7.7% of all hearings scheduled) could not be conducted because inmates had already been shipped to IDOC (n=54, or 5.6%) or were otherwise unavailable at the jail (n=20, or 2.1%).
[3] Criminal cases in which prosecutors enter a plea of *nolle prosequi* frequently result in findings of no probable cause in King hearings, while cases which are stricken on leave to reinstate (SOL) appear to be evaluated on an individual basis in King hearings.

Decree. Our assessment of the timeliness of these hearings lacks certitude, because the schedules for hearings at CCDOC do not include dates of admission to jail or dates parole warrants were served.[4] The absence of these data inhibits the ability to empirically evaluate the timeliness of hearings and to ensure that parole warrants were served in all cases. Despite the absence of these data, our observations at **King** hearings and numerous **Duran** monitoring visits do not support the contention that **King** hearings conducted at CCDOC are occurring beyond the 10-day time limit specified in the provisions of the Consent Decree.

At NRC, the schedules for hearings do contain admission and warrant service dates, but requests for continuances that occur with considerable frequency make accurate calculation of timeliness of **King** hearings somewhat difficult in these cases. This has not, however, precluded an analysis of compliance with the provision requiring a **King** hearing within 10 days of imprisonment.

Data provided by the PRB indicate that a total of approximately 1,810 **King** hearings occurred at NRC between January 4, 2007 and August 9, 2007. During this period, the average (mean) length of time between incarceration and initial **King** hearings was 8.6 days. As noted above, however, a significant number of continuances are requested at initial hearings, and, in these cases, more than 10 business days elapse before final decisions on probable cause for parole revocation are rendered. Delays beyond the 10-day limit have occurred in approximately 23% of all cases, although there has been considerable fluctuation in the incidence of lengthy (more than 10 days) continuances since January 2007.

[4] The forms currently used do contain a column for date served (for parole warrant/notice) that is not used but do not contain a column for jail admission date.

While these delays represent a potential cause for concern, further scrutiny by the monitor and other interested parties is needed to determine the cumulative duration of the parole revocation hearing process, which now normally includes two or more hearings. This will require detailed analysis of several hundred cases, which must be tracked over time. It is our hope that this analysis and other future monitoring activities may shed light on the effect of rapid transfers to prison on access to counsel for pretrial detainees being held in IDOC facilities, crowding at CCDOC, and the costs associated with transporting inmates from CCDOC to NRC to criminal courts in Cook County.

The monitor also seeks input from the parties and the Court on a question that does not appear to have been addressed in the Consent Decree or raised in meetings with the parties since its entry. While decree provisions specify time limits for hearings at both CCDOC and IDOC, there is no provision clarifying whether these time limits are specific to incarceration at each facility or should be calculated on a cumulative basis (*i.e.* – beginning with admission to CCDOC and continuing through transfer to NRC). If directed by the Court, we will attempt to gather and analyze such information, which would be presented in future monitoring reports.

**CONDUCT OF HEARINGS**

Jeanetta Cardine, an Executive with the Illinois Prisoner Review Board, has served as the designated **King** hearing officer for the vast majority of hearings conducted pursuant to the Consent Decree in this case. On occasions when she has taken vacation time, other PRB staff have conducted these hearings.

At each hearing, the inmate is routinely sworn immediately by the Hearing Officer, who also verifies that s/he has received notice of charges. The Hearing Officer also reads the specific violations alleged and, in many cases, explains these allegations.

Two or more IDOC Parole Agents are present at all **King** hearings in their capacities as King investigators. These agents are sworn in by the Hearing Officer at the beginning of each day's hearings. They provide testimony at each hearing based on information in police reports or communications from other law enforcement agents.

In all hearings observed by the Monitor, the **King** investigators attempted and usually succeeded in contacting the arresting officer or law-enforcement investigator for confirmation and/or elaboration on information contained in arrest reports. At a minimum, the investigators verify that police "stand by the information" in their reports.[5] This very cursory confirmation may be supplemented with more detailed information about the alleged offense or subsequent investigation. This information may extend beyond the evidentiary basis for the arrests to the nature of the alleged offense (*e.g.* - violent v. non-violent, quantities of drugs seized), injuries to victims, and other pertinent information.

In all hearings observed by the Monitor and hearing reports, **King** investigators have obtained and conveyed the names and badge numbers of law-enforcement personnel with whom they have spoken. Virtually all **King** hearing reports reviewed by the Monitor have included notations regarding the information obtained by the **King** investigators. The **King** investigators

---

[5] "SBR" (stands by report) has become a standard acronym on King hearing reports.

also frequently contact other IDOC parole agents who have information pertinent to the situation of the inmates. These contacts often reveal other pertinent information, such as participation in mandatory activities including substance abuse treatment programs or compliance with electronic detention conditions. Some of this information may constitute grounds for a technical parole violation, separate and distinct from the criminal charges that led to the incarceration of the individual. When such information has been provided, it appears to be considered by the **King** Hearing Officer.

During (as well as prior to) **King** hearings, the **King** investigators routinely utilize data contained in several computerized databases. These include two IDOC systems, which are the AMS system utilized by IDOC's Parole Division and the Offender Tracking System (OTS) utilized by IDOC's Adult Division (institutions); in addition, a GPS tracking system utilized by Parole Agents is also accessible and utilized occasionally. CCDOC's Correctional Inmate Management Information System (CIMIS) is also utilized routinely for hearings at the jail. The database maintained by the Clerk of the Circuit Court of Cook County is also utilized frequently, when information regarding current and former criminal charges is needed.

Based on our observations of dozens of hearings on four occasions, JHA staff can report that Ms. Cardine appears to be scrupulously fair in her handling of cases. We observed numerous cases in which she rendered a finding of no probable cause because time limits had been exceeded and for other appropriate reasons, including dismissal of criminal charges. We have observed hearings and reviewed records in which inmates were not served in timely fashion, and in these cases the Hearing Officer entered a finding of no probable cause.

We also observed many cases in which Ms. Cardine took immediate action to modify conditions of supervision to more appropriately meet the needs of parolees. She has recommended that parolees be assigned substance abuse treatment programs and facilities, the utilization or reinstatement of electronic detention, or other modifications.[6] We have been impressed that she has been able to collaborate with PRB Chairman Jorge Montes, who has used his authority to initiate such modifications pending approval by the full PRB. The fact that Ms. Cardine and Mr. Montes have taken such action immediately following the hearings has facilitated the prompt release of many inmates, whose parole status has been reinstated with minimal delay.

**Participation by Witnesses and Attorneys**

Although few in number, witnesses have participated in **King** hearings at both CCDOC and NRC. Most of the witnesses who have participated have testified on behalf of inmates, although at least one police officer has also appeared to testify against the inmate. To date, all witnesses have appeared in person. A videoconferencing site has been established but not utilized thus far.[7] In those cases in which witnesses have chosen to come to the facilities, the **King** Hearing Officer has interviewed them in the lobby of the facility (Division V of CCDOC) or immediately outside the main entrance (at NRC), both of which are outside the presence of the

---

[6] In addition to her responsibilities as the primary King Hearing Officer, Ms. Cardine spends much of her time on similar tasks with other parolees whose needs require modification of conditions of supervision. This experience and expertise is a valuable asset in her work in this case.

[7] IDOC has made videoconferencing facilities for witnesses and attorneys available at an IDOC facility at 100 North Western Avenue in Chicago. Videoconferencing with the NRC (and other IDOC facilities) is possible when this system is working. In a few of these situations, witnesses whose identity has been positively established by IDOC staff at the facility have been permitted to participate telephonically when videoconferencing has been unavailable. At NRC, the videoconferencing equipment is not available in the room used for King hearings but is accessible to the King hearing officer.

inmate (or his representative). The decision to interview witnesses in these locations is attributed to security concerns regarding public access to internal portions of the facilities.

A few attorneys have also participated in these hearings. Some of these individuals asked to participate by telephone, which raised the issue of establishing positive identification of all attorneys who might seek to participate in this manner. These situations were a cause of concern for PRB staff and the Monitor, who discussed this issue with plaintiffs' counsel and the parties. Since that time, no requests for attorney participation by phone have been received.

The fact that witnesses are not physically or telephonically present at the same time and place as the inmates may be construed as precluding inmates from the opportunity to confront and cross-examine the witnesses. While it appears that Ms. Cardine does pose questions requested by the inmates to the witnesses and dutifully documents their responses, the Monitor recommends that the Court, with input from the parties, should clarify whether this arrangement satisfies legal requirements for the meaningful exercise of this right.

It is the opinion of the Monitor that such arrangements are not satisfactory. Both CCDOC and IDOC administrators should consider how to accommodate witnesses in an office setting or in a comparable space. We suggest that the parties explore the availability of space in the Criminal Courts Building at 2600 South California Avenue, where civilian witnesses and police officers could be afforded easy access in an environment that provides appropriate security for all concerned.

11

**Hearing Accommodations**

Hearings conducted at CCDOC take place in the Receiving Room, located in the basement of Division V. This location has a number of drawbacks and can only be described as minimally adequate. It is, however, one of the only areas within the vast jail complex that is readily available to inmates from all 10 divisions. The **King** Hearing Officer uses a booth normally used for intake screening. The booth provides a reasonable modicum of privacy. Inmates scheduled for **King** hearings are held in a nearby bullpen. IDOC Parole Agents participating in these hearings occupy adjacent booths and respond to questions from the Hearing Officer. Only the individuals participating in the hearings are normally within earshot of the hearing, although Correctional Officers are stationed in the general area.

At NRC, the **King** hearings take place in an area designated as a classroom (but slated for conversion into a law library) in one of the cellblocks in the facility. This spacious area includes ample desk space and seating for the Hearing Officer, Parole Agents, and the inmate/parolee. Inmates awaiting hearings are lined up outside the hearing room and, although the door to the room is left open, the inmates are at sufficient distance from the door that there is reasonable privacy for discussions of potentially sensitive matters. Other than those persons participating in the hearings, only a Correctional Officer is present in the room during hearings, for security reasons.

## CROWDING AT CCDOC AND INMATE TRANSFERS

As the court monitor in **Duran v. Sheahan et al.**, the John Howard Association is thoroughly familiar with the status of inmate population and crowding at CCDOC. In addition to

court monitoring reports, JHA issues monthly updates on inmate population, crowding, and the utilization of release mechanisms to reduce the level of crowding. As documented in our most recent update, dated August 7, 2007 (attached as Appendix A), the size of the overflow population at the jail has increased in recent months, having decreased for several months previously. While we are unable to identify all of the factors contributing to the resurgence of inmate population and crowding at CCDOC, it is clear that significant budget cuts affecting the Cook County Sheriff's Office (and most other Cook County agencies) contributed to significant reductions in the number of inmates being released from CCDOC and placed on electronic monitoring and in a day reporting program. These programs were critical components of the Sheriff's efforts to minimize crowding, and the size of their caseloads or populations since January 2006 is described in the table entitled Cook County Release Mechanisms: Average Daily Caseloads/Population, contained in the attached appendix.

As noted at page 3 above, efforts by CCDOC administrators and other officials of the Office of the Sheriff of Cook County to expedite the transfer of inmates with unexpired terms of confinement have received renewed emphasis since the beginning of 2007. Transfer of previously sentenced inmates to the IDOC was authorized in an order by Judge George M. Marovich in **Duran v. Sheahan et al.**, issued October 30, 2003 permitting the Sheriff to transfer persons housed at CCDOC who had been previously sentenced to IDOC for an unexpired sentence of confinement. This order was precipitated by recurring episodes of increased crowding at CCDOC aggravated by the presence of hundreds of IDOC inmates who had been housed at CCDOC on court writs and by the presence of as many as 1,600 pretrial detainees with parole holds or warrants. Since entry of Judge Marovich's order, former Sheriff Michael F.

Sheahan and current Sheriff Thomas Dart have returned hundreds of inmates to IDOC custody, who were still serving prison sentences or facing revocation of parole.

A recently announced closing of approximately 500 beds for a renovation project at CCDOC will exacerbate crowding that has already increased significantly in recent months. JHA staff are currently attempting to meet with CCDOC and IDOC officials to discuss this situation and the implications for additional expedited transfers of inmates back to IDOC custody. While increased transfers of inmates from CCDOC to IDOC could provide some additional relief for the crowding at CCDOC, it will create additional burdens for IDOC. The IDOC currently transports scores of inmates from NRC to the Criminal Courts Building on a daily basis, and demands on transportation may be expected to increase.

**JUVENILE PAROLE VIOLATORS**

An increasing number of parole violation cases involve individuals charged with crimes who are under juvenile parole supervision. These juvenile parolees are 17 years or older but remain under juvenile parole supervision based on an adjudication of delinquency which occurred before their seventeenth birthday. These persons have been housed at CCDOC, based on their age at the time of the most recent adult offense. They are being transferred to the Illinois Department of Juvenile Justice[8] on the basis of an alleged violation of parole as a juvenile delinquent where they will wait in custody pending the outcome of their full PRB hearings.

---

[8] IDJJ was formerly the Juvenile Division of IDOC and still maintains jurisdiction of all persons committed to state custody and/or supervision as juveniles. IDJJ facilities still house both committed juveniles and youth tried and sentenced as adults pursuant to automatic transfer provisions of state law.

14

According to IDJJ Director Kurt Friedenauer, an increasing number of these young adults have been shipped to the Illinois Youth Center - Saint Charles, which serves as the Reception Center for juvenile males for the northern part of the state. These individuals arrive with little notice, and reports indicate that they are literally picked up en route along with juveniles being transported from the Cook County Juvenile Temporary Detention Center. These individuals are both older and, in many cases, physically larger and more aggressive than most of the juveniles incarcerated in IDJJ facilities. Director Friedenauer indicates that IDJJ assigns many of these individuals to IYC – Joliet, which is the only maximum-security juvenile facility in Northern Illinois.

IDJJ administrators report that some of these individuals have been responsible for a number of serious incidents, including assaults on staff and residents, following their admission to juvenile facilities. JHA staff plan to visit both IYC – St. Charles and IYC – Joliet to determine the status of this problem and as a basis for formulating recommendations to IDJJ officials on management of these youthful offenders. We also intend to request meetings with The Honorable Paul P. Biebel, Jr., Presiding Judge of the Criminal Division, and the Honorable Curtis Heaston, Presiding Judge of the Juvenile Division of the Circuit Court of Cook County, to discuss avenues for resolving the jurisdictional issues involved in these cases.

## CONCLUSIONS

The number of **King** hearings that have been conducted thus far and that will need to be held in the foreseeable future is largely attributable to IDOC's practice of issuing parole warrants in virtually all cases in which parolees are charged with a new crime. A significant percentage of

these charges are later dropped, but the court appearances involved in this process contribute to crowded court dockets, overcrowding at CCDOC, and now to a crowded schedule of preliminary (and final) parole revocation hearings.

The frequency and duration of continuances of **King** hearings are a function of criminal case processing in the Circuit Court of Cook County.[9] Many of the new criminal charges that trigger the parole revocation process are non-violent in nature. While public policies underlying the State's Attorney's charging practices are likely beyond the scope of the Court's concerns in this case, it may be prudent to ask all interested parties whether parole violation warrants need to be issued immediately upon receipt of information that a parolee has been arrested on a new charge, at least until probable cause has been determined in the new case.

JHA staff have also detected an underlying tension and opposition between PRB staff and IDOC personnel. Some IDOC staff oppose King requirements or hearing outcomes. Some IDOC staff assume that most or all parole warrants should or will lead to virtually automatic parole revocation. The PRB takes a more flexible approach and regards the **King** hearing as a meaningful decision process, the outcome of which is not a foregone conclusion. The Monitors believe this approach reflects the intent of this Court and deserves respect. IDOC administrators should convey to their employees the need for respect for the PRB's decision-making role. It is our hope that the continued development of the process initiated in this case will lead to enhanced cooperation.

---

[9] The most recent comprehensive study of this system was documented in a report entitled *Review of the Cook County Felony Case Process and Its Impact on the Jail Population,* September 26, 2005, by the Criminal Courts Technical Assistance Project, American University, Washington, D.C. The report's findings regarding case processing timelines and preliminary hearings in particular are relevant to the issues in **King.**

**RECOMMENDATIONS**

1. PRB staff should ensure that hearing schedules consistently include dates of admission to the jail and dates of service of parole warrants.

2. A number of other changes are needed to improve the conduct, quality, and transparency of **King** hearings.

3. These include the need for more suitable space for these hearings, either within CCDOC or at the Criminal Courts Building.

4. Additional technical resources, including more laptop computers with wireless internet capability and portable printers, should be available at all hearings at both CCDOC and NRC.

5. The Monitors urge the Court and parties to emphasize to state officials the importance of the PRB's request for funding for additional staff to conduct **King** hearings. Much of the initial success of this effort is due to Ms. Cardine, who has made an extremely impressive start on this process. No activity of such importance and scope should be dependent primarily on a single individual, no matter how talented and dedicated she may be.

Future monitoring reports will include more detailed analysis of the cumulative duration of incarceration for inmates facing parole revocation, including those who request continuances; in addition, analysis of the reasons for findings of probable cause and no probable cause will be a primary component of our next report.

# POPULATION AND CAPACITY SUMMARY
# COOK COUNTY DEPARTMENT OF CORRECTIONS
# THROUGH JULY 31, 2007

August 7, 2007

**Duran v. Sheahan et al.**
74 C 2949
The Honorable Virginia M. Kendall
United States District Court
for the
Northern District of Illinois
Eastern Division

**John Howard Association**
300 West Adams, Suite 423
Chicago, Illinois 60606
312-782-1901
e-mail: info@john-howard.org

**Cook County Department of Corrections**
**2007 POPULATION AND CAPACITY SUMMARY**

| | Available Beds | Average Daily Population | Overflow Population (Daily Average) | ADP/C[10] Aggregate Release Mechanisms | No. of Days of Overcrowding |
|---|---|---|---|---|---|
| Jan | 9803 | 9548.5 | 501.6 | 1901.1 | 31/31 |
| Feb | 9820 | 9314.3 | 364.8 | 1789.8 | 28/28 |
| Mar | 9754 | 9429.9 | 410.2 | 1688.4 | 31/31 |
| Apr | 9803 | 9520.2 | 458.9 | 1706.4 | 30/30 |
| May | 9790 | 9354.6 | 317.6 | 1594.3 | 31/31 |
| Jun | 9713 | 9478.3 | 363.5 | 1537.8 | 29/30 |
| Jul | 9792 | 9607.9 | 441.6 | 1516.9 | 31/31 |
| YEAR-TO-DATE TOTAL | na | na | na | na | na |
| DAILY AVERAGE | 9781.8 | 9504.8 | 408.9 | 1675.3 | 211/212 |

JOHN HOWARD ASSOCIATION

---

[10] Average Daily Population/Caseload.

## Cook County Department of Corrections
## INSTITUTIONAL GROWTH: 1988 - 2007

| | Average Daily Population | Year-to Year Growth | Available Beds | Year-to Year Growth | Occupancy Level | Overflow Population | Year-to Year Growth |
|---|---|---|---|---|---|---|---|
| 1988 | 5327 | na | 5571 | na | 95.6% | 138.7 | na |
| 1989 | 6492 | + 21.9% | 6150 | +10.4% | 105.6% | 582.8 | +320.2% |
| 1990 | 6827 | + 5.2% | 6217 | - 1.1% | 109.8% | 806.0 | + 38.3% |
| 1991 | 7590 | + 11.2% | 6173 | - 0.7% | 123.0% | 1499.4 | + 86.0% |
| 1992 | 8789 | + 15.8% | 6623 | + 6.6% | 132.7% | 2443.0 | + 62.9% |
| 1993 | 8881 | + 1.0% | 7953 | +20.1% | 111.7% | 1543.4 | - 36.8% |
| 1994 | 8907 | + 0.3% | 7927 | - 0.3% | 112.4% | 1455.7 | - 5.7% |
| 1995 | 8751 | - 1.8% | 7683 | - 3.1% | 113.9% | 1360.4 | - 6.5% |
| 1996 | 9035 | + 3.2% | 8857 | +15.3% | 102.0% | 624.7 | - 54.1% |
| 1997 | 9153 | + 1.3% | 9262 | + 4.6% | 98.8% | 414.1 | - 33.7% |
| 1998 | 9475 | + 3.5% | 9360 | + 1.1% | 101.2% | 531.9 | + 28.4% |
| 1999 | 9492 | + 0.2% | 9639 | + 3.0% | 98.5% | 304.3 | - 42.8% |
| 2000 | 9953 | + 4.9% | 9721 | + 0.9% | 102.4% | 535.4 | + 75.9% |
| 2001 | 10642 | + 6.9% | 9720 | ~ 0.0% | 109.5% | 1147.1 | +114.3% |
| 2002 | 11082 | + 4.1% | 9827 | + 1.1% | 112.8% | 1419.6 | + 23.8% |
| 2003 | 10664 | - 3.8% | 10100 | + 2.8% | 105.6% | 990.3 | - 30.2% |
| 2004 | 10536 | - 1.2% | 9932 | - 1.6% | 106.1% | 950.4 | - 4.0% |
| 2005 | 9776 | - 7.2% | 9641 | - 2.9% | 101.4% | 643.7 | - 32.3% |
| 2006 | 9360 | - 4.3% | 9838 | + 2.0% | 95.1% | 266.5 | - 58.6% |
| 2007* | 9505 | + 1.5% | 9782 | - 0.6% | 97.2% | 408.9 | + 3.4% |
| **Cumulative Growth** | + 4178 | + 78.4% | + 4211 | +75.6% | + 1.6% | + 270.2 | +194.8% |

- 2007 data through July 31, 2007.

## Cook County Release Mechanisms
## AVERAGE DAILY CASELOADS/POPULATION
## June 2006 – July 2007

| | NON-CUSTODIAL | | | | CUSTODIAL | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | EMP | DRP | SFFP/ CCDAW | AGGREGATE DLY CSLD | PRC | WJSRP | MOMS | AGGREGATE DAILY POP | AVG DLY POP ALL REL MECH |
| JAN 2006 | 1521 | 431 | 180.3 | 2132 | 437.7 | 114.5 | 15.6 | 567.8 | 2699.8 |
| FEB | 1481 | 418 | 169.4 | 2068 | 440.7 | 116.8 | 13.7 | 571.2 | 2639.2 |
| MAR | 1433 | 398 | 166.2 | 1997 | 441.2 | 109.8 | 12.6 | 563.6 | 2560.6 |
| APR | 1365 | 435 | 152.7 | 1953 | 440.5 | 108.6 | 14.2 | 563.3 | 2516.3 |
| MAY | 1129 | 461 | 160.4 | 1750 | 441.3 | 111.5 | 15.6 | 568.4 | 2318.4 |
| JUN | 792 | 447 | 156.1 | 1395 | 439.7 | 111.0 | 16.2 | 566.9 | 1961.9 |
| JUL | 605 | 381 | 148.8 | 1135 | 440.6 | 107.6 | 14.7 | 562.9 | 1697.9 |
| AUG | 809 | 287 | 154.4 | 1250 | 438.1 | 116.0 | 14.1 | 568.2 | 1818.2 |
| SEP | 967 | 253 | 158.7 | 1379 | 441.3 | 116.5 | 13.0 | 570.8 | 1949.8 |
| OCT | 1013 | 231 | 138.0 | 1382 | 440.2 | 115.7 | 12.5 | 568.4 | 1950.4 |
| NOV | 1034 | 296 | 159.0 | 1489 | 434.4 | 102.7 | 12.3 | 549.4 | 2038.4 |
| DEC | 926 | 330 | 147.5 | 1404 | 438.1 | 111.5 | 15.2 | 564.8 | 1968.8 |
| X̄ (2006) | 1089.6 | 364.0 | 157.6 | 1611.2 | 439.5 | 111.5 | 14.1 | 565.1 | 2176.3 |
| JAN 2007 | 917 | 281 | 133.9 | 1332 | 438.5 | 116.7 | 13.9 | 569.1 | 1901.1 |
| FEB | 855 | 250 | 122.4 | 1227 | 441.0 | 115.5 | 6.3 | 562.8 | 1789.8 |
| MAR | 908 | 184 | 143.4 | 1235 | 440.1 | 115.0 | 7.5 | 562.6 | 1798.0 |
| APR | 848 | 140 | 146.2 | 1141 | 439.3 | 117.1 | 9.0 | 565.4 | 1706.4 |
| MAY | 743 | 141 | 140.0 | 1027 | 440.7 | 116.7 | 9.9 | 567.3 | 1594.3 |
| JUN | 675 | 153 | 138.2 | 966 | 447.0 | 115.4 | 9.4 | 571.8 | 1537.8 |
| JUL | 649 | 159 | 141.4 | 949 | 442.2 | 117.5 | 8.2 | 567.9 | 1516.9 |
| X̄ (2007) | 798.9 | 186.3 | 138.1 | 1124.5 | 441.2 | 116.3 | 9.2 | 566.7 | 1691.2 |