**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHARLES KING, ANDREW BROWN, ) <br> CHIOKE HILL, THOMAS GILBERT, ) <br> NELSON MUNIZ, ANTHONY SMITH ) <br> and ANDRE McGREGG, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> ROGER E. WALKER and ) <br> JESSE MONTGOMERY, ) <br> ) <br> Defendants. ) | No. 06 C 204 <br><br> Hon. Robert W. Gettleman |

**PLAINTIFFS' STATUS REPORT ON THE
<u>IMPLEMENTATION OF THE AMENDED CONSENT DECREE</u>**

Counsel for Plaintiffs is pleased to report that the Defendants have made significant progress implementing the terms of the Amended Consent Decree. The Defendants have ensured class members' right to have the hearing officer consider witness testimony,[1] a significant change from the practice prior to the Amended Decree. The Hearing Officer is clearly using independent judgment in her determinations, as she no longer informs parolees that certain charges require an automatic finding of probable cause. And the location of the hearings is much better suited to due process proceedings. Specifically, the Cook County hearings are no longer held in the basement of Division 5 of the Jail but rather in a much quieter section of Division 8—the Residential

---

[1] Exhibit two contains samples of the completed witness notification form. These forms indicate some record keeping inconsistencies. On some forms, the hearing officer has recorded her efforts to contact the witnesses. Other forms do not contain this information. Also, when a parolee declines to list witnesses, some forms include the words "no witnesses" and are initialed by the parolees. Other forms are blank and it is thus unclear whether the parolee ever received the form. Defendants should standardize the record keeping process—the hearing officer should record all efforts to contact witnesses on the sheet in the space

1

Therapy wing of the Jail.

Despite these positive reforms, two significant violations of the Decree must be addressed. The first relates to the admonition the hearing officer provides to parolees and the hearing officer's related practice of soliciting admissions from parolees, despite their right to remain silent during these proceedings. And the second relates to the role of the King Investigator; specifically, the Investigators remain little more than stand-ins for the parolees' arresting officers and/or parole agents.

Below the Plaintiffs report their findings based on observing approximately 120 individuals' hearings, a review of 32 parolee's revocation documents, and interviews with parolees.

## I. THE PAROLEE RIGHTS ADMONISHMENT IS DELIVERED IN A MANNER THAT RENDERS IT INCOMPREHENSIBLE.

The Amended Consent Decree requires that parolees receive an admonishment concerning their rights in the parole revocation process (Exhibit C to the Amended Consent Decree), including their right to remain silent during these proceedings. The undersigned observed the hearing officer reading the admonishment to a large group of parolees while they were waiting in the hallway for the hearings to begin. After she finished reading, the hearing officer asked the group *en masse* if they wanted to proceed with their hearings. Some—but not all— of the parolees answered aloud in the affirmative, some nodded their heads, and many remained silent. The question of whether each individual parolee wanted to proceed with his hearing or understood his rights was never re-visited during the actual hearings.

Parolees confirmed that this process of providing a group admonishment does not serve its

---

provided, and the parolees should initial the form in the event that they decline to identify witnesses. This will ensure all parties can track compliance with the requirements of this Decree.

intended function of notifying the parolees of their rights:

- "I was read my rights by a prelim board member. I must say as I recall I didn't understand them the way they were read." Exhibit 1 (Declaration of Percy Jones)

- "I was placed in a hallway or wing of NRC along with 20 other offenders. Shortly after one of the hearing officers came out of an office . . . to read us the offenders . . . right for the hearing. I was unable to understand the hearing officer who was reading us our rights because of how fast she may have been reading them and or because of the noise level in this wing of the NRC." Ex. 1 (Dec. of Michael Bush).

When the hearing officer convenes each individual hearing she does not re-read the admonishment or ask if the parolees have any questions about their procedural rights. The practice adopted by the Defendants affords the parolees only one opportunity during the group admonishment to be informed of their rights, ask questions about the process, or ask for a continuance in order to exercise their rights, including their right to provide additional witness contact information. This practice violates the Amended Decree, which provides that "the hearing officer will explain the rights described in these paragraphs to the Parolee at the beginning of *each* hearing using the admonishment contained in Exhibit C." Decree at ¶ 23(l) (emphasis added).

As described below, the consequences of this flawed process are serious. Parolees routinely make admissions that are against their interests both because they are not adequately informed of their rights and because of the overt actions of the hearing officer, described in Part II. Plaintiffs request that the Defendants cease the practice of providing a group admonishment and instead provide individual admonishments, ensuring that each parolee understands these rights, as required by the terms of the Amended Consent Decree.

**II. THE HEARING OFFICER ELICITS ADMISSIONS FROM PAROLEES AND THEN USES THESE ADMISSIONS TO FIND PROBABLE CAUSE.**

The parolee rights admonishment is frequently rendered meaningless during the actual hearings because the hearing officer as a general practice elicits admissions from the parolee,

effectively negating parolees' right to remain silent. The undersigned observed the hearing officer asking parolees questions such as, "when did you last check in with your parole agent?" and "did you do what was stated in the parole violation report?" The undersigned also observed the hearing officer interrogate parolees and at least once, she accused a parolee of lying when his answers appeared inconsistent. Because of the informal nature of the proceedings—and because the parolees are not informed of their rights in a meaningful manner—it is abundantly clear that the parolees who make admissions are not knowingly waiving their rights to be silent. The exchanges between the hearing officer and the parolees are informal and conversational in nature, and sometimes the parolees are not even certain that they are speaking to the hearing officer, the individual who is charged with making the probable cause determination. *See* Exhibit 1 (Dec. of Burnyss Perry) ("I was not made aware of who the parties were in the room.").

The hearing officer's "reports of findings" illustrate the hearing officer's practice of eliciting parolee admission and then using those admissions to find probable cause. *See*, *e.g.*, Exhibit 3 (Report of Findings documenting admissions). This trend was also noted by the designees of Plaintiffs' counsel, as described in their declarations. *See* Exhibit 5 (Ahmed Dec.) at ¶ 26 ("The hearing officer found probable cause based on [Parolee] admitting he was AWOL."); *id*. at ¶ 29 ("The hearing officer found probable due to the fact that [Parolee] admitted he did not comply with all orders."); *id*. at ¶ 33 ("The hearing officer found probable cause due to the fact that Harris admitted to being AWOL").

Plaintiffs request that the Defendants instruct the hearing officer that she is prohibited from eliciting admissions from parolees and then using these admissions to find probable cause. While the Amended Consent Decree does not explicitly prohibit this practice, it clearly does require that the Defendants protect the rights of parolees to remain silent during their hearing—

and to ensure that their silence cannot be used against them. Decree at ¶ 23(i) ("A parolee may remain silent during the preliminary parole revocation hearing and the Hearing Officer cannot use his or her silence in making a decision as to probable cause."). The Defendants have adopted a practice that clearly violates this provision of the decree. They must cease eliciting admissions from parolees immediately.

### III.   KING INVESTIGATORS ARE NOT NEUTRAL.

One of the most significant protections contained in the Amended Consent Decree is the requirement that the King Investigators be neutral in their investigations and testimony. Prior to the adoption of the Amended Decree, the Plaintiffs established that the King Investigators functioned as "stand-ins" for the parolee's arresting officer and/or violating agent. In an effort to remedy this violation, the Amended Consent Decree requires that King Investigators remain neutral during the hearings and that they "at a minimum" review the police report and any supporting documentation and interview the investigating/arresting officer. The King investigators "may conduct such further investigations as necessary in his or her discretion to provide the Hearing Officer . . . with the facts and circumstances surrounding the Parolee's alleged parole violation." Unfortunately, the King Investigators continue to do little more than read aloud the reports written by arresting officers and/or the violating parole agents. In none of the hearings that Plaintiffs' counsel or their designees observed, did the King Investigators conduct an investigation that went beyond the minimum requirements, and no King Investigator affirmatively presented any information that would support the parolees' defense or present their case in a positive light. For instance, King Investigators regularly failed to volunteer positive information about parolees that was clearly available to them in the computer system—such as whether a parolee was attending school or was employed. King Investigators would occasionally

5

provide this information, but only if prompted to do so by the Hearing Officers.

Additionally, during several hearings observed by the undersigned, parolees were facing potential revocation based on new criminal charges. In these cases, the King Investigators recounted their conversations with the arresting officer in great detail, providing the Hearing Officer with an account of the alleged offense. But the King Investigators often neglected to mention that the criminal court had actually dismissed these charges—information that surfaced only after the Hearing Officer inquired about the outcome of the criminal court's probable cause determination. This failure to affirmatively inform the Hearing Officer about the dismissal suggests that the King Investigators continue to function as little more than mouthpieces for the arresting officers.

The King Investigators also reveal their lack of neutrality by the way they comport themselves during the hearings. The undersigned observed King Investigators scoffing at parolees during their testimony, rolling their eyes, shaking their heads and otherwise conveying distain and disbelief through their body language. This was identified as an issue last year, and remains unchanged. *See* Exhibit 5 (Ahmed Dec.) at ¶11 ("One King Investigator seemed to be especially harsh by smirking and scoffing at times . . . Both King Investigators only read reports . . .All of these reports consisted of simply reading what staff members in the police department and/or parole agent involved in the case said. In many hearing the King Investigators would read the police reports word for word. Sometimes, the King Investigators would look into a program known as AMS . . .No further investigation was conducted in any of the hearings.); Exhibit 4 (Dickson Dec.) at ¶11-12 ("The King Investigators, however, were visibly biased in many of the hearings. I observed one rolling her eyes and sighing loudly in many of the hearings. The King Investigator testimony I observed was merely the King Investigator stating when he or she called

6

the police officer and then reading the police report out loud. Occasionally, the King Investigator would look something up [on the computer] but it was always at the prompting of the hearing officer. It appeared that nothing about the parolees, such as job or education status had been investigated prior to the hearing."); Exhibit 1 (Younger Dec.) ("the King Investigator . . .was using hand gestures and talking while I was talking to the hearing officer. Just not giving me a chance to finish speaking at all"); Exhibit 1 (Bush Dec.) ("And a couple other hearing officers acted unprofessionally during the proceeding when I started explaining my side of the story, by being biased with [sic] shaking their heads.")

The Plaintiffs suggest the King Investigator function may need to be abolished or further reformed since it is abundantly clear that the Plaintiff class receives no benefit from this provision of the decree.

## IV. CONCLUSION

With the marked exception of the provisions described above, the Plaintiffs have not received information suggesting that the Defendants are substantially out of compliance with the Decree. The Plaintiffs request that the Court order the Defendants to file status reports in 90 days to determine if the Defendants have addressed the violations described above. Additionally, the Plaintiffs are putative class counsel in *Morales v. Monreal*, 1:13-cv-07572, a case that seeks the appointment of counsel for all eligible people who face parole revocation proceedings. The parties are in settlement negotiations. Any remedy in that case will likely affect the implementation of the Amended Consent Decree here and will likely require further amendments to the *King* Decree. The Plaintiffs would like to apprise the Court of any relevant developments in the *Morales* case in their next Status Report.

Respectfully submitted:                                    Dated: December 19, 2014

/s/ Sheila A. Bedi
Sheila A. Bedi
Alexa A. Van Brunt
Roderick and Solange MacArthur Justice Center
Northwestern University School of Law
375 East Chicago Avenue
Chicago, Illinois 60611

Alan Mills
Uptown People's Law Center
4413 North Sheridan
Chicago, Illinois 60640

Counsel for the Plaintiff Class

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that she served the foregoing document upon all counsel who have entered an appearance in this matter by via CMECF on December 19, 2014.

    /s/ Sheila A. Bedi